---

No. 22-51019

---

# United States Court of Appeals for the Fifth Circuit

---

UNITED STATES OF AMERICA,

*Plaintiff–Appellant,*

*v.*

LITSSON ANTONIO PEREZ-GALLAN,

*Defendant–Appellee.*

---

Appeal from the United States District Court
for the Western District of Texas
No. 4:22-CR-427-DC

---

## APPELLANT UNITED STATES OF AMERICA'S RENEWED MOTION TO STAY FURTHER PROCEEDINGS, OR, ALTERNATIVELY, EXTEND TIME TO FILE APPELLANT'S BRIEF

Under Federal Rule of Appellate Procedure 27 and Fifth Circuit Rule 27.1.3, the government moves to stay further proceedings in this case pending the government's petition for a writ of certiorari in *United States v. Rahimi*, No. 22-915. In support of this motion, the government shows:

Perez was indicted in the Western District of Texas for possessing a gun while subject to a domestic-violence restraining order. (ROA.22.) *See*

18 U.S.C. § 922(g)(8). Perez moved to dismiss the indictment, arguing that § 922(g)(8) violates the Second Amendment. (ROA.44–64.) The district court ruled that § 922(g)(8) facially violates the Second Amendment and thus granted Perez's motion to dismiss. (ROA.205–36.) *See United States v. Perez-Gallan*, No. 4:22-CR-427-DC, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022).

The government appealed the district court's Second Amendment ruling. On February 2, 2023, while this appeal was pending, this Court held in a separate case that § 922(g)(8) facially violates the Second Amendment. *See United States v. Rahimi*, 59 F.4th 163 (5th Cir. 2023). On March 3, it withdrew its original opinion and issued a substitute opinion. *See United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023). The substitute opinion reached the same conclusion as the original opinion and thus likewise held that § 922(g)(8) facially violates the Second Amendment. *See id.* at 461. Were *Rahimi* to stand, it would foreclose the government's appeal here.

The government believes that this Court wrongly decided *Rahimi*. On March 17, 2023, the government filed a petition for a writ of certiorari asking the Supreme Court to review this Court's decision. *See* Exhibit A. The government argues that this Court erred in its Second Amendment holding and so incorrectly held an important federal statute facially unconstitutional. The government also observes that *Rahimi* conflicts with the precedents of two other circuits. "Given the significant disruptive consequences of [this Court's] decision," the government has sought

certiorari "on a highly expedited schedule—a little more than two weeks after the issuance of [this Court's] final amended opinion—in order to allow the [Supreme] Court to consider the petition before it recesses for the summer." *Id*. at 15–16.

A stay of further proceedings is warranted here because the final outcome of *Rahimi* would be outcome-determinative here. If the Supreme Court grants certiorari and holds that § 922(g)(8) is constitutional, that conclusion would compel reversal here. In contrast, if the Supreme Court denies certiorari or grants and affirms, that conclusion would compel affirmance here. A stay would therefore promote the fair and efficient resolution of this case. A stay would produce the least possible delay because the government has sought certiorari on an expedited schedule so that the Supreme Court can consider the petition during the current term. In addition, a stay would not prejudice Perez, who was ordered released and currently has no federal indictment actively pending against him. (ROA.236–37, 240.)

\*\*\*\*\*\*

For these reasons, the government respectfully requests that this Court vacate the briefing schedule in this case and stay further proceedings pending resolution of the government's petition for a writ of certiorari in *United States v. Rahimi*, No. 22-915. If the Court denies a stay, the government requests that this Court grant the government an additional 14 days, to and including April 26, 2023, to file its appellant's brief.

Respectfully submitted,

JAIME ESPARZA
United States Attorney

*/s/ Charles E. Fowler, Jr.*
CHARLES E. FOWLER, JR.
Assistant United States Attorney

4

## CERTIFICATE OF CONFERENCE

I certify that on March 28, 2023, I contacted Perez's counsel, Shane O'Neal, who stated that Perez opposes this motion.

*/s/ Charles E. Fowler, Jr.*
CHARLES E. FOWLER, JR.
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that on March 28, 2023, I filed this motion through this Court's electronic case-filing system, which will serve it on all registered counsel.

*/s/ Charles E. Fowler, Jr.*
CHARLES E. FOWLER, JR.
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

I certify that

1. this motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 550 words, excluding parts exempted by Rule 32(f); and

2. this motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 365 in size 14 Calisto MT font.

Dated: March 28, 2023

*/s/ Charles E. Fowler, Jr.*
CHARLES E. FOWLER, JR.
Assistant United States Attorney

# Exhibit A
# Petition for Writ of Certiorari
# *United States v. Rahimi*, No. 22-915

**No.**

# In the Supreme Court of the United States

---

UNITED STATES OF AMERICA, PETITIONER

*v.*

ZACKEY RAHIMI

---

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

---

**PETITION FOR A WRIT OF CERTIORARI**

---

ELIZABETH B. PRELOGAR
*Solicitor General
Counsel of Record*
KENNETH A. POLITE, JR.
*Assistant Attorney General*
BRIAN H. FLETCHER
*Deputy Solicitor General*
VIVEK SURI
*Assistant to the Solicitor
General*
WILLIAM A. GLASER
*Attorney*

*Department of Justice
Washington, D.C. 20530-0001
SupremeCtBriefs@usdoj.gov
(202) 514-2217*

## QUESTION PRESENTED

Whether 18 U.S.C. 922(g)(8), which prohibits the possession of firearms by persons subject to domestic-violence restraining orders, violates the Second Amendment on its face.

(I)

## RELATED PROCEEDINGS

United States District Court (N.D. Tex.):

*United States* v. *Rahimi*, No. 21-cr-83 (Sept. 27, 2021)

United States Court of Appeals (5th Cir.):

*United States* v. *Rahimi*, No. 21-11001 (Feb. 2, 2023)

(II)

**TABLE OF CONTENTS**

Page

Opinion below......................................................................... 1
Jurisdiction............................................................................. 1
Constitutional and statutory provisions involved..................... 1
Statement .............................................................................. 2
Reasons for granting the petition ............................................ 6
    A.  The court of appeals erred in holding that the
        Second Amendment precludes Congress from
        disarming individuals subject to domestic-violence
        restraining orders........................................................... 8
    B.  This Court should review the decision below ............ 13
Conclusion ............................................................................ 17
Appendix A — Court of appeals opinion (Mar. 2, 2023) ....... 1a
Appendix B — Court of appeals opinion
               (Feb. 2, 2023) ............................................. 42a
Appendix C — Court of appeals order (July 7, 2022) ......... 70a
Appendix D — Court of appeals opinion
               (June 8, 2022)............................................. 72a
Appendix E — District court order (June 3, 2021) ............. 78a
Appendix F — Constitutional and statutory provisions..... 81a

**TABLE OF AUTHORITIES**

Cases:

    *Allen* v. *Cooper*, 140 S. Ct. 994 (2020)................................... 14
    *Barr* v. *American Ass'n of Political Consultants,*
      *Inc.*, 140 S. Ct. 2335 (2020)................................................. 13
    *Blodgett* v. *Holden*, 275 U.S. 142 (1927) .............................. 13
    *District of Columbia* v. *Heller*, 554 U.S. 570 (2008)... 7, 8, 10
    *Georgia* v. *Randolph*, 547 U.S. 103 (2006) ........................ 15
    *Iancu* v. *Brunetti*, 139 S. Ct. 2294 (2019)............................ 13
    *Kanter* v. *Barr*, 919 F.3d 437 (7th Cir. 2019)...................... 12
    *Maricopa County* v. *Lopez-Valenzuela,*
      574 U.S. 1006 (2014).......................................................... 13

(III)

IV

Cases—Continued:                                                     Page

*NRA* v. *Bureau of Alcohol, Tobacco, Firearms, &
  Explosives*, 700 F.3d 185 (5th Cir. 2012),
  cert. denied, 571 U.S. 1196 (2014) ........................................ 8

*New York State Rifle & Pistol Association* v. *Bruen*,
  142 S. Ct. 2111 (2022) ............................ 5, 6, 9, 10, 12-14, 16

*Torres* v. *Texas Department of Public Safety*,
  142 S. Ct. 2455 (2022) .................................................... 13

*United States* v. *Bena*, 664 F.3d 1180 (8th Cir. 2011) ........ 14

*United States* v. *Boyd*, 999 F.3d 171 (3d Cir.),
  cert. denied, 142 S. Ct. 511 (2021) .................................... 14

*United States* v. *Castleman*, 572 U.S. 157 (2014) ........... 7, 15

*United States* v. *Chapman*,
  666 F.3d 220 (4th Cir. 2012) ............................................. 15

*United States* v. *Emerson*, 270 F.3d 203 (5th Cir.
  2001), cert. denied, 536 U.S. 907 (2002) ............................ 11

*United States* v. *Hayes*, 555 U.S. 415 (2009) ...................... 6

*United States* v. *McGinnis*,
  956 F.3d 747 (5th Cir. 2020), cert. denied,
  141 S. Ct. 1397 (2021) ................................................ 5, 15

*United States* v. *Reese*,
  627 F.3d 792 (10th Cir. 2010), cert. denied,
  563 U.S. 990 (2011) ........................................................ 15

*United States* v. *Vaello Madero*,
  142 S. Ct. 1539 (2022) .................................................... 13

Constitution and statutes:

U.S. Const. Amend. II ............................... 4, 5, 7, 9, 10, 14, 16
Act for Constituting a Council of Safety, ch. 40, § 20,
  1777 N.J. Laws 90 ............................................................. 9
Act of May 1, 1776, ch. 21, § 1, 1776 Mass. Acts 479 ............ 8
Act for the Punishing of Criminal Offenders,
  1692 Mass. Laws 11-12 ...................................................... 9

V

Statutes—Continued:                                    Page

Act for the Punishing Criminal Offenders,
   1696-1701 N.H. Laws 15 ....................................... 9

Act of June 13, 1777, ch. 21, § 4, 1777 Pa. Laws 63 ............. 8

Bipartisan Safer Communities Act,
   Pub. L. No. 117-159, § 12004, 136 Stat. 1313:
     § 12004, 136 Stat. 1329 ..................................... 4

Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13........................ 8

18 U.S.C. 921(a)(32) .................................................. 4

18 U.S.C. 922(g) ....................................................... 13

18 U.S.C. 922(g)(8).............................................. 3-7, 11, 14, 15

18 U.S.C. 922(g)(8)(A) .............................................. 4

18 U.S.C. 922(g)(8)(B) .............................................. 4

18 U.S.C. 922(g)(8)(C) ........................................... 4, 11

18 U.S.C. 924(a)(2) (2018) ........................................ 4

18 U.S.C. 924(a)(2)................................................... 3

18 U.S.C. 924(a)(8)................................................... 4

La. Rev. Stat. Ann. § 14:79(A)(4) (Supp. 2023).................. 15

Mass. Rev. Stat. 750 (1836)........................................ 10

Me. Rev. Stat. ch. 169, § 16, 709 (1840)............................. 10

Mich. Rev. Stat. ch. 162, § 16, 692 (1846) .......................... 10

Tex. Fam. Code Ann. (West Supp. 2019):
     § 85.022(a)........................................................ 11
     § 85.022(b)(1)..................................................... 11

Tex. Penal Code Ann. § 46.04(c) (West Supp. 2022) .......... 15

Miscellaneous:

Act of May 28, 1777, ch. 3 (Va.), *reprinted in*
   9 William Waller Hening, *The Statutes at Large;*
   *Being a Collection of all the Laws of Virginia from*
   *the First Session of the Legislature, in the Year*
   *1619* (1821) ....................................................... 8

Cong. Globe, 39th Cong., 1st Sess. (1866) .......................... 10

VI

Miscellaneous—Continued:                                    Page

Diarmuid F. O'Scannlain, *Glorious Revolution to
American Revolution: The English Origin of the
Right to Keep and Bear Arms*, 95 Notre Dame L.
Rev. 397 (2019) ................................................................. 8

William Rawle, *A View of the Constitution of the
United States of America* (2d ed. 1829) .......................... 10

2 Bernard Schwartz, *The Bill of Rights:
A Documentary History* (1971) ......................................... 9

# In the Supreme Court of the United States

———

No.

UNITED STATES, PETITIONER

*v.*

ZACKEY RAHIMI

———

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

———

**PETITION FOR A WRIT OF CERTIORARI**

———

The Solicitor General, on behalf of the United States, respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Fifth Circuit in this case.

**OPINION BELOW**

The opinion of the court of appeals (App., *infra*, 1a-41a) is not yet published in the Federal Reporter, but is available at 2023 WL 2317796.

**JURISDICTION**

The judgment of the court of appeals was entered on March 2, 2023. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

**CONSTITUTIONAL AND STATUTORY PROVISIONS
INVOLVED**

Pertinent constitutional and statutory provisions are reproduced in the appendix. App., *infra*, 81a-82a.

(1)

2

**STATEMENT**

1. Respondent Zackey Rahimi was a drug dealer who "mostly sold marijuana and occasionally sold cocaine." C.A. ROA 211. In December 2019, Rahimi and his girlfriend C.M. had an argument in a parking lot in Arlington, Texas. *Id.* at 217. C.M. tried to leave, but Rahimi grabbed her wrist, knocking her to the ground. *Ibid.* He then dragged her back to his car, picked her up, and pushed her inside, causing her to hit her head on the dashboard. *Ibid.* Realizing that a bystander had seen him, he retrieved a gun and fired a shot. *Ibid.* In the meantime, C.M. escaped the car and fled the scene. *Ibid.* Rahimi later called her and threatened to shoot her if she told anyone about the assault. *Ibid.*

In February 2020, after giving Rahimi notice and an opportunity for a hearing, a Texas state court granted C.M. a restraining order, which was valid for two years. C.A. ROA 12-18. The court found that Rahimi had "committed family violence" and that such violence was "likely to occur again in the future." *Id.* at 13. The court accordingly prohibited Rahimi from committing family violence and from threatening, harassing, or approaching C.M. or her family. *Id.* at 13-14. The order also suspended Rahimi's handgun license, prohibited him from possessing a firearm, and warned him that possessing a firearm while the order remained in effect may be a federal felony. *Id.* at 14, 16. Rahimi signed an acknowledgement that he had "received a copy of this protective order in open court at the close of the hearing in this matter." *Id.* at 18.

Rahimi, however, defied the restraining order. In August 2020, he tried to communicate with C.M. on social media and approached her house in the middle of the night, prompting state police to arrest him for vio-

3

lating the order. C.A. ROA 218. And in November 2020, he threatened another woman with a gun, leading the State of Texas to charge him with aggravated assault with a deadly weapon. *Id.* at 219.

Rahimi then participated in a series of five shootings in December 2020 and January 2021. First, after some-one who had bought drugs from him "started talking 'trash'" on social media, he went to the man's home and fired bullets into it using an AR-15 rifle. C.A. ROA 209. The next day, after colliding with another vehicle, he alighted from his car, shot at the other driver, fled, re-turned to the scene, fired more shots at the other car, and fled again. *Ibid.* Three days later, Rahimi fired a gun in the air in a residential neighborhood in the pres-ence of young children. *Id.* at 210. A few weeks after that, a truck flashed its headlights at Rahimi when he sped past it on a highway; in response, Rahimi slammed his brakes, cut across the highway, followed the truck off an exit, and fired multiple shots at another car that had been traveling behind the truck. *Ibid.* Finally, in early January, Rahimi pulled out a gun and fired multi-ple shots in the air after a friend's credit card was de-clined at a fast-food restaurant. *Ibid.*

Police officers identified Rahimi as a suspect in those shootings and secured a search warrant for his home. C.A. ROA 210. A search of his room uncovered a .45-caliber pistol, a .308-caliber rifle, pistol and rifle maga-zines, ammunition, approximately $20,000 in cash, and a copy of the restraining order. *Id.* at 211.

2. A federal grand jury in the Northern District of Texas indicted Rahimi for violating 18 U.S.C. 922(g)(8) and 924(a)(2). C.A. ROA 19-22. Section 922(g)(8), which Congress enacted in 1994, prohibits a person who is sub-ject to a domestic-violence restraining order from pos-

4

sessing a firearm in or affecting commerce. At the time of Rahimi's conduct, a knowing violation of Section 922(g)(8) was punishable by up to ten years of imprisonment. 18 U.S.C. 924(a)(2) (2018).[1]

To trigger Section 922(g)(8), a restraining order must satisfy three conditions. First, a court must have issued the order after giving the person subject to it notice and an opportunity to be heard. 18 U.S.C. 922(g)(8)(A). Second, the order must forbid the person from harassing, stalking, or threatening an "intimate partner," the person's child, or an intimate partner's child. 18 U.S.C. 922(g)(8)(B); see 18 U.S.C. 921(a)(32) (defining "intimate partner"). Third, the order must either (1) include a finding that the person poses a "credible threat" to the physical safety of the intimate partner or child or (2) explicitly prohibit the use, attempted use, or threatened use of physical force against the intimate partner or child. 18 U.S.C. 922(g)(8)(C).

The restraining order in this case satisfied each of those requirements. Rahimi received notice and an opportunity to be heard. C.A. ROA 12. C.M. was Rahimi's intimate partner because they had a child together. *Id.* at 13. And the order both contained a finding that Rahimi posed a credible threat to C.M.'s physical safety and prohibited the threatened use of physical force against C.M. *Id.* at 13-14.

Rahimi moved to dismiss the indictment, arguing that Section 922(g)(8) violates the Second Amendment on its face. C.A. ROA 41-59. The district court denied the motion, observing that the Fifth Circuit had upheld

---

[1] Congress has since increased the maximum punishment to 15 years of imprisonment. See 18 U.S.C. 924(a)(8); see also Bipartisan Safer Communities Act, Pub. L. No. 117-159, § 12004, 136 Stat. 1313, 1329.

5

the constitutionality of Section 922(g)(8) in *United States* v. *McGinnis*, 956 F.3d 747 (2020), cert. denied, 141 S. Ct. 1397 (2021). App., *infra*, 78a-80a. Rahimi then pleaded guilty. C.A. ROA 68-69, 160. The court sentenced him to 73 months of imprisonment, to be followed by three years of supervised release. *Id.* at 96.

3. The Fifth Circuit at first affirmed, reasoning that its decision in *McGinnis* foreclosed Rahimi's Second Amendment challenge. App., *infra*, 73a n.1; see *id.* at 72a-77a. But after this Court decided *New York State Rifle & Pistol Association* v. *Bruen*, 142 S. Ct. 2111 (2022), the Fifth Circuit withdrew its opinion. App., *infra*, 70a-71a. After receiving supplemental briefing on *Bruen*, the court reversed. *Id.* at 42a-69a. A month later, the court withdrew that opinion and issued an amended opinion that again reversed. *Id.* at 1a-41a.

The Fifth Circuit held that Section 922(g)(8) violates the Second Amendment on its face. App., *infra*, 7a-27a. The court began by reasoning that Rahimi fell "within the Second Amendment's scope." *Id.* at 8a. It acknowledged that this Court has described the right to keep and bear arms as a right belonging to "'ordinary, law-abiding citizens,'" but it interpreted that phrase to exclude only "'felons,'" "'the mentally ill,'" and other "groups that have historically been stripped of their Second Amendment rights." *Id.* at 8a-9a (citations omitted). The Fifth Circuit concluded that, although Rahimi was "hardly a model citizen," he was not a "convicted felon" or otherwise excluded from the Second Amendment's scope. *Id.* at 10a-11a.

The court of appeals stated that, because Rahimi presumptively fell within the Second Amendment's scope, the government bore the burden of identifying historical analogues to Section 922(g)(8)—that is,

6

longstanding regulations "that imposed 'a comparable burden on the right of armed self-defense' that were also 'comparably justified.'" *Id.* at 17a (quoting *Bruen*, 142 S. Ct. at 2132-2133). The court then rejected each of the analogues the government offered. For example, the government cited a 17th-century English statute disarming individuals judged to be dangerous, but the court concluded that the statute was "not a forerunner of our Nation's historical tradition of firearm regulation." *Id.* at 18a. The government cited colonial and early state laws disarming categories of individuals legislatures "considered to be dangerous," but the Fifth Circuit distinguished those laws on the ground that they operated on a categorical basis, while Section 922(g)(8) rests on individualized findings. *Id.* at 19a. The government also cited colonial and state laws under which a person who was found to pose a threat to someone else could bear arms only if he posted a surety. *Id.* at 24a-25a. But the Fifth Circuit emphasized that surety laws imposed only a "partial restriction" on the right to keep and bear arms, while Section 922(g)(8) "works an absolute deprivation of the right." *Id.* at 26a.

Judge Ho issued a concurring opinion. App., *infra*, 29a-41a. He found Section 922(g)(8) "difficult to justify" because it disarms individuals "based on civil protective orders" rather than "criminal proceedings." *Id.* at 36a. He expressed concern that such orders are susceptible to "abuse." *Id.* at 37a.

## REASONS FOR GRANTING THE PETITION

"Firearms and domestic strife are a potentially deadly combination." *United States* v. *Hayes*, 555 U.S. 415, 427 (2009). More than a million acts of domestic violence occur in the United States every year, and the presence of a firearm increases the chance that violence

will escalate to homicide. *United States* v. *Castleman*, 572 U.S. 157, 160 (2014); see *id.* at 159-160. "All too often, * * * the only difference between a battered woman and a dead woman is the presence of a gun." *Id.* at 160 (brackets and citation omitted).

In Section 922(g)(8), Congress sought to address that problem by disarming individuals who are subject to domestic-violence restraining orders. That prohibition comes into operation only if a court finds, after notice and a hearing, that a person poses a credible threat to the physical safety of an intimate partner or child or expressly forbids the person from using, attempting to use, or threatening to use physical force against the intimate partner or child. And the prohibition lasts only as long as the restraining order remains in effect.

The Fifth Circuit, however, concluded that Section 922(g)(8) violates the Second Amendment—not just as applied to a particular defendant, but on its face. That holding was profoundly mistaken. Governments have long disarmed individuals who pose a threat to the safety of others, and Section 922(g)(8) falls comfortably within that tradition. The Fifth Circuit's contrary decision misapplies this Court's precedents, conflicts with the decisions of other courts of appeals, and threatens grave harms for victims of domestic violence. This Court should grant certiorari and reverse.

### A. The Court Of Appeals Erred In Holding That The Second Amendment Precludes Congress From Disarming Individuals Subject To Domestic-Violence Restraining Orders

1. The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." That right, however, is "not unlimited." *District of Columbia* v. *Heller*, 554 U.S. 570, 595 (2008).

8

This Court has recognized, for example, that the Second Amendment allows the government to ban "dangerous and unusual weapons," *id.* at 627 (citation omitted), and to exclude weapons from "sensitive places," *id.* at 626. So too, the Second Amendment allows the government to disarm dangerous individuals—that is, those who would pose a serious risk of harm to themselves or to others if allowed to possess a firearm.

The Second Amendment "codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (citation omitted). In England, a 17th century statute empowered the government to "seize all arms in the custody or possession of any person" who was "judge[d] dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13. The use of that statute "continued unabated" after the adoption of the 1689 English Bill of Rights, which expressly guaranteed the right to keep and bear arms. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405 (2019).

Colonial and early state legislatures likewise disarmed individuals who "posed a potential danger" to others. *NRA* v. *Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012), cert. denied, 571 U.S. 1196 (2014). Some early laws categorically disarmed entire groups deemed dangerous or untrustworthy, such as those who refused to swear allegiance. *Ibid.*; see, *e.g.*, Act of May 1, 1776, ch. 21, § 1, 1776 Mass. Acts 479; Act of June 13, 1777, ch. 21, § 4, 1777 Pa. Laws 63; Act of May 28, 1777, ch. 3 (Va.), *reprinted in* 9 William Waller Hening, *The Statutes at Large; Being a Collection of all the Laws of Virginia from the First Session of the Legislature, in the Year*

*1619*, at 281-283 (1821).  Other laws called for case-by-case judgments about dangerousness.  See, *e.g.*, Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90 (empowering officials to "take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements and Ammunition which they own or possess").  Still other laws disarmed individuals who had demonstrated their dangerousness by engaging in particular types of conduct, such as carrying arms in a manner that spreads fear or terror among the people.  See, *e.g.*, Act for the Punishing of Criminal Offenders, 1692 Mass. Laws 11-12; Act for the Punishing Criminal Offenders, 1696-1701 N.H. Laws 15.

Precursors to the Second Amendment proposed in the state ratifying conventions likewise suggest that legislatures may disarm certain categories of individuals, including those who are dangerous.  A proposal presented at the Pennsylvania ratifying convention, for instance, stated that "no law shall be passed for disarming the people or any of them unless for crimes committed, *or real danger of public injury from individuals*." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (emphasis added).  A proposal presented by Samuel Adams at the Massachusetts ratifying convention likewise provided that Congress may not "prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms."  *Id.* at 681 (emphasis added).

Post-ratification practice points in the same direction.  In the mid-19th century, many States enacted laws requiring "those threatening to do harm" to "post bond before carrying weapons in public."  *New York State Rifle & Pistol Ass'n* v. *Bruen*, 142 S. Ct. 2111, 2148

10

(2022); see, *e.g.*, Mass. Rev. Stat. ch. 134, § 16, 750 (1836); Me. Rev. Stat. ch. 169, § 16, 709 (1840); Mich. Rev. Stat. ch. 162, § 16, 162 (1846). Those statutes show that individuals who were "reasonably accused of intending to injure another or breach the peace" could properly be subject to firearm restrictions that did not apply to others. *Bruen*, 142 S. Ct. at 2148-2149. Or as one early scholar wrote, the government may properly restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them." William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829).

The understanding that dangerous individuals could be disarmed persisted after the Civil War. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," but that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-909 (1866). A circular issued by the Freedman's Bureau at around the same time explained that a person "may be disarmed if convicted of making an improper or dangerous use of weapons." *Bruen*, 142 S. Ct. at 2152 (citation omitted).

In keeping with that history, this Court explained in *Heller* that the right to keep and bear arms belongs only to "law-abiding, responsible citizens." 554 U.S. at 635. And in *Bruen*, the Court stated that the Second Amendment protects the right of "an ordinary, law-abiding citizen" to possess and carry arms for self-defense. 142 S. Ct. at 2122. Those descriptions suggest that the government may properly disarm citizens who are dangerous, irresponsible, or unlikely to abide by the law.

Section 922(g)(8) fits squarely within the longstanding tradition of disarming dangerous individuals. Section 922(g)(8) applies only if the restraining order either (1) includes a finding that the individual poses a "credible threat to the physical safety" of an intimate partner or child or (2) expressly prohibits the "use, attempted use, or threatened use of physical force" against the intimate partner or child. 18 U.S.C. 922(g)(8)(C). Everyone who satisfies the first criterion, by definition, poses a danger to others. And in adopting the second criterion, Congress reasonably concluded that courts would specifically prohibit the use, attempted use, or threatened use of force only if "evidence credited by the court reflected a real threat or danger of injury to the protected party." *United States* v. *Emerson*, 270 F.3d 203, 262 (5th Cir. 2001), cert. denied, 536 U.S. 907 (2002). The Texas law that authorized the restraining order against respondent, for example, empowers a court to prohibit a person from "committing family violence" if that person has been "found to have committed family violence" and the court determines that an order is "necessary or appropriate to prevent or reduce the likelihood of family violence" in the future. Tex. Fam. Code Ann. §§ 85.022(a) and (b)(1) (West Supp. 2019).

2. In concluding that Section 922(g)(8) lacks adequate historical support, the Fifth Circuit missed the forest for the trees. The court overlooked the strong historical evidence supporting the general principle that the government may disarm dangerous individuals. The court instead analyzed each historical statute in isolation and dismissed each one on the ground that it differed from Section 922(g)(8) in some way. For example, the court discounted many laws because they rested on "categori[cal]" judgments of dangerousness or unsuita-

12

bility to possess firearms rather than individualized findings. App., *infra*, 19a. The court discounted other laws because they sought to protect "society generally," not to prevent harm to "identified individuals." *Id.* at 24a. And it disregarded still other laws because they disarmed individuals only after criminal convictions, not after civil proceedings. *Ibid.*

As an initial matter, the Fifth Circuit's reasoning was wrong on its own terms. Although some historical laws disarmed categories of individuals legislatures considered dangerous, other laws disarmed those who had been found dangerous on a case-by-case basis. See pp. 8-10, *supra*. And it would be bizarre if legislatures could disarm dangerous individuals based on categorical presumptions, but not based on individualized judicial findings after notice and a hearing. Similarly, although some early laws disarmed those who posed a threat to society at large, others applied to those who posed threats to identified victims. See pp. 8-10, *supra*. Finally, the Fifth Circuit was wrong to suggest that the government cannot disarm dangerous individuals who have not yet been convicted of crimes. As the laws discussed above show, legislatures have long disarmed "dangerous people who have not been convicted of felonies." *Kanter* v. *Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting).

More fundamentally, the Fifth Circuit's mode of analysis was flawed. Although courts interpreting the Second Amendment must consider text, history, and tradition, they should not focus on whether the law at issue has "a historical *twin*." *Bruen*, 142 S. Ct. at 2133. To the contrary, this Court emphasized that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass

13

constitutional muster." *Ibid.* Section 922(g)(8) is "analogous enough" to its "historical precursors" because it imposes similar burdens for similar reasons. *Ibid.* Like them, it allows ordinary, law-abiding citizens to keep and bear arms while disarming individuals who pose a danger to others. Indeed, Section 922(g)'s temporary disarmament imposes a significantly lesser burden than those precursor laws, and does so for an especially compelling reason—preventing acute and demonstrated threats of domestic violence.

**B. This Court Should Review The Decision Below**

1. This Court's review is warranted because the Fifth Circuit held an important federal statute unconstitutional on its face. Judging the constitutionality of a federal statute is "the gravest and most delicate duty that this Court is called on to perform." *Blodgett* v. *Holden*, 275 U.S. 142, 148 (1927) (opinion of Holmes, J.). Accordingly, "when a lower court has invalidated a federal statute," the Court's "usual" approach is to grant certiorari. *Iancu* v. *Brunetti*, 139 S. Ct. 2294, 2298 (2019). Indeed, the Court applies a "strong presumption in favor of granting writs of certiorari to review decisions of lower courts holding federal statutes unconstitutional." *Maricopa County* v. *Lopez-Valenzuela*, 574 U.S. 1006, 1007 (2014) (statement of Thomas, J., respecting the denial of the application for a stay).

This Court has thus recently and repeatedly reviewed decisions invalidating federal statutes even in the absence of a circuit conflict. See, *e.g.*, *Haaland* v. *Brackeen*, No. 21-376 (argued Nov. 9, 2022); *Torres* v. *Texas Department of Public Safety*, 142 S. Ct. 2455, 2461 (2022); *United States* v. *Vaello Madero*, 142 S. Ct. 1539, 1542 (2022); *Barr* v. *American Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2345-2346 (2020)

14

(plurality opinion); *Allen* v. *Cooper*, 140 S. Ct. 994, 1000 (2020).  The Court should follow the same course here.

2.  This Court's review also is warranted because the Fifth Circuit's decision in this case conflicts with two court of appeals decisions that predated *Bruen* but that remain good law today.  In the years preceding *Bruen*, the courts of appeals had "coalesced around a 'two-step' framework for analyzing Second Amendment challenges." *Bruen*, 142 S. Ct. at 2125.  At the first step, the government could justify the challenged regulation by showing that it fell outside the scope of the Second Amendment as originally understood; at the second step, it could justify the regulation by showing that it survived strict or intermediate scrutiny. See *id.* at 2126. In *Bruen*, this Court recognized that the first step was "broadly consistent with *Heller*," but rejected the second step as "one step too many." *Id.* at 2127.

Before *Bruen*, the Third and Eighth Circuits both upheld Section 922(g)(8) under the first step of that two-part framework.  In *United States* v. *Boyd*, 999 F.3d 171, cert. denied, 142 S. Ct. 511 (2021), the Third Circuit found "longstanding historical support" for the principle that "'legislatures have the power to prohibit  dangerous people from possessing guns.'" *Id.* at 186 (citation omitted).  It then concluded that "those who are subject to domestic violence protective orders covered by § 922(g)(8) fall within the historical bar of presumptively dangerous persons." *Ibid.*  Similarly, in *United States* v. *Bena*, 664 F.3d 1180 (2011), the Eighth Circuit cited "historical support" for disarming "citizens who are not law-abiding and responsible." *Id.* at 1183.  The court concluded that Section 922(g)(8) is consistent with the "tradition" of limiting the right to keep and bear arms to "peaceable" citizens. *Id.* at 1184. Because those

15

decisions applied the historical approach that *Bruen* endorsed, rather than the tiers-of-scrutiny approach that *Bruen* rejected, they remain controlling precedents in the Third and Eighth Circuits. The decision below directly conflicts with those decisions.[2]

3. The exceptional importance of the question presented underscores the need for this Court's review. "[D]omestic abuse is a serious problem in the United States." *Georgia* v. *Randolph*, 547 U.S. 103, 117 (2006). Tens of millions of Americans "will, in the course of their lifetimes, be the victims of intimate-partner abuse." *Ibid.* And the presence of a gun in a house with a domestic abuser increases the risk of homicide sixfold. See *Castleman*, 572 U.S. at 160.

The Fifth Circuit held, however, that the Second Amendment forecloses Congress's effort to address that danger through Section 922(g)(8). That holding has led to the suspension of criminal prosecutions under Section 922(g)(8) in the nine judicial districts within the Fifth Circuit. It has cast doubt on the enforceability of Section 922(g)(8) state-law counterparts in Louisiana and Texas. See La. Rev. Stat. Ann. § 14:79(A)(4) (Supp. 2023); Tex. Penal Code Ann. §§ 46.04(c) (West Supp. 2022). And if allowed to stand, it would thwart Congress's considered judgment that persons who have been found to be a threat to their intimate partners or children should not be permitted to acquire or possess firearms. Given the significant disruptive consequences

---

[2] Three other courts of appeals, including the Fifth Circuit itself, previously upheld Section 922(g)(8) under intermediate scrutiny. See *United States* v. *Chapman*, 666 F.3d 220, 231 (4th Cir. 2012); *United States* v. *McGinnis*, 956 F.3d 747, 758 (5th Cir. 2020), cert. denied, 141 S. Ct. 1397 (2021); *United States* v. *Reese*, 627 F.3d 792, 801-804 (10th Cir. 2010), cert. denied, 563 U.S. 990 (2011).

16

of the Fifth Circuit's decision, the government is filing this petition for a writ of certiorari on a highly expedited schedule—a little more than two weeks after the issuance of the Fifth Circuit's final amended opinion—in order to allow the Court to consider the petition before it recesses for the summer.

4. Finally, this Court should grant review so that it can correct the Fifth Circuit's misinterpretation of *Bruen*. In *Bruen*, the Court emphasized that its historical test did not create a "regulatory straightjacket" and that the government retains substantial power to regulate firearms to protect public safety. 142 S. Ct. at 2133. Justice Alito emphasized the limits of the Court's holding, writing that it "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." *Id.* at 2157 (Alito, J., concurring). Justice Kavanaugh, too, wrote that, under the Court's decision, the Second Amendment "allows a 'variety' of gun regulations." *Id.* at 2162 (Kavanaugh, J., concurring) (citation omitted).

The Fifth Circuit's decision contradicts those assurances. The Fifth Circuit treated even minor and immaterial distinctions between historical laws and their modern counterparts as a sufficient reason to find the modern laws unconstitutional. If that approach were applied across the board, few modern statutes would survive judicial review; most modern gun regulations, after all, differ from their historical forbears in at least some ways. This Court should grant the petition for a writ of certiorari to clarify that, contrary to the Fifth Circuit's view, the Second Amendment allows the government to disarm dangerous individuals, including those subject to domestic-violence restraining orders.

17

**CONCLUSION**

The petition for a writ of certiorari should be granted.

Respectfully submitted.

ELIZABETH B. PRELOGAR
*Solicitor General*
*Counsel of Record*
KENNETH A. POLITE, JR.
*Assistant Attorney General*
BRIAN H. FLETCHER
*Deputy Solicitor General*
VIVEK SURI
*Assistant to the Solicitor*
*General*
WILLIAM A. GLASER
*Attorney*

MARCH 2023