No. 22-51019

# United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff–Appellant,*

*v.*

LITSSON ANTONIO PEREZ-GALLAN,

*Defendant–Appellee.*

Appeal from the United States District Court
for the Western District of Texas
No. 4:22-CR-427-DC

## APPELLANT'S BRIEF FOR THE UNITED STATES

JAIME ESPARZA
United States Attorney

CHARLES E. FOWLER, JR.
Assistant United States Attorney
Western District of Texas
903 San Jacinto, Suite 334
Austin, Texas 78701
Phone: (512) 370-1265
Fax: (512) 916-5854

## Recommendation on Oral Argument

Oral argument is unneeded. Precedent forecloses the government's arguments, which the government raises to preserve for further review. *See United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *pet. for cert. filed*, No. No. 22-915 (Mar. 17, 2023).

# TABLE OF CONTENTS

RECOMMENDATION ON ORAL ARGUMENT ............................. i

TABLE OF CONTENTS ........................................................ ii

TABLE OF AUTHORITIES ................................................. iii

JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUE ................................................. 1

STATEMENT OF THE CASE ................................................. 1

SUMMARY OF THE ARGUMENT ........................................... 4

STANDARD OF REVIEW ..................................................... 5

ARGUMENT ................................................................... 5

    I.    The Second Amendment's plain text does not cover those
subject to domestic-violence restraining orders. ...................... 7

    II.    Section 922(g)(8) squares with the nation's historical
tradition of gun regulation. .................................................. 13

CONCLUSION .............................................................. 21

CERTIFICATE OF SERVICE ............................................... 22

CERTIFICATE OF COMPLIANCE ......................................... 22

## Table of Authorities

### Cases

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ................................................................. passim

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco,
   Firearms, & Explosives*,
   700 F.3d 185 (5th Cir. 2012) ........................................... 14, 16

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) ............................................................. passim

*Range v. Att'y Gen.*,
   53 F.4th 262 (3d Cir. 2022) .................................... 8, 9, 12

*Robertson v. Baldwin*,
   165 U.S. 275 (1897) ............................................................ 7

*Sabri v. United States*,
   541 U.S. 600 (2004) ............................................................. 6

*United States v. Bena*,
   664 F.3d 1180 (8th Cir. 2011) ........................................ 20

*United States v. Black*,
   No. CR 22-133-01,
   2023 WL 122920 (W.D. La. Jan. 6, 2023) ........................ 11

*United States v. Boyd*,
   999 F.3d 171 (3d Cir. 2021) .............................................. 20

*United States v. Castleman*,
   572 U.S. 157 (2014) ............................................................. 4

*United States v. Chapman*,
   666 F.3d 220 (4th Cir. 2012) ............................................ 20

*United States v. Charles*,
   No. MO:22-CR-00154-DC,
   2022 WL 4913900 (W.D. Tex. Oct. 3, 2022) ..................... 16

*United States v. DaSilva*,
   No. 3:21-CR-267,
   2022 WL 17242870 (M.D. Penn. Nov. 23, 2022) .............. 8

*United States v. Emerson*,
   270 F.3d 203 (5th Cir. 2001) ..................................... 12, 19

*United States v. Grinage,*
   No. SA-21-CR-00399-JKP,
   2022 WL 17420390 (W.D. Tex. Dec. 5, 2022)...................................14

*United States v. Hayes,*
   555 U.S. 415 (2009).............................................................................. 4

*United States v. Howard,*
   766 F.3d 414 (5th Cir. 2014).............................................................. 5

*United States v. Jimenez-Shilon,*
   34 F.4th 1042 (11th Cir. 2022)........................................................... 8

*United States v. Kelly,*
   No. 3:22-CR-00037,
   2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022)..............................14

*United States v. Lewis,*
   No. CR-22-368-F,
   2023 WL 187582 (W.D. Okla. Jan. 13, 2023)...................................15

*United States v. McGinnis,*
   956 F.3d 747 (5th Cir. 2020)........................................................ 6, 20

*United States v. Nutter,*
   No. 2:21-CR-00142,
   2022 WL 3718518 (S.D.W. Va. Aug. 29, 2022) ................................15

*United States v. Perez-Gallan,*
   --- F. Supp. 3d ---, 2022 WL 16858516 (W.D. Tex. 2022).................3, 4

*United States v. Rahimi,*
   61 F.4th 443 (5th Cir. 2023) .........................................................i, 3, 8

*United States v. Reese,*
   627 F.3d 792 (10th Cir. 2010)...........................................................20

*United States v. Salerno,*
   481 U.S. 739 (1987)............................................................................. 6

*United States v. Sitladeen,*
   --- F.4th ----, 2023 WL 2765015 (8th Cir. 2023) ...............................12

*Washington State Grange v. Washington State Republican Party,*
   552 U.S. 442 (2008)............................................................................. 6

## Statutes

18 U.S.C. § 922 ..................................................................passim

18 U.S.C. § 3231 ....................................................................... 1

18 U.S.C. § 3731 ....................................................................... 1

Ky. Rev. Stat. § 237.110 ..........................................................11

Ky. Rev. Stat. § 403.730 ............................................................ 2

Ky. Rev. Stat. § 431.064 ............................................................ 1

Ky. Rev. Stat. § 508.030 ............................................................ 1

Ky. Rev. Stat. § 525.060 ............................................................ 1

La. Stat. Ann. § 40:1379.3 ........................................................11

## Historical Laws

Act for Constituting a Council of Safety, ch. 40, § 20, 1777
   N.J. Laws ...........................................................................17

Act for the Punishing of Criminal Offenders, 1696–1701
   N.H. Laws ...........................................................................17

Act for the Punishing of Criminal Offenders, 1692 Mass.
   Laws ....................................................................................17

Act of June 13, 1777, ch. 21, § 4, 1777 Pa. Laws .................17

Act of May 1, 1776, ch. 21, § 1, 1776 Mass. Acts ................17

Act of May 28, 1777, ch. 3 (Va.), *reprinted in* 9 William
   Waller Hening, *The Statutes at Large; Being a Collection of all
   the Laws of Virginia from the First Session of the Legislature, in
   the Year 1619* (1821) ...........................................................17

Cong. Globe, 39th Cong., 1st Sess. 908–09 (1866) ..............18

Mass. Rev. Stat. ch. 134, § 16, 750 (1836)...........................18

Me. Rev. Stat. ch. 169, § 16, 709 (1840)...............................18

Mich. Rev. Stat. ch. 162, § 16, 162 (1846)............................18

Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13..........................16

## Scholarship

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971)..............................................................................17

Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397 (2019) .........................................16

William Rawle, *A View of the Constitution of the United States of America* (2d ed. 1829) ...................................................18

## Federal Rules

Fed. R. App. P. 32 ................................................................22

Fed. R. App. P. 4 .............................................................. 1

## JURISDICTION

The government appeals a final order dismissing the indictment in a criminal case. (ROA.205–236.) The district court had jurisdiction under 18 U.S.C. § 3231. The government timely noticed this appeal. (ROA.241–42.) *See* Fed. R. App. P. 4(b)(1)(B)(i). This Court has jurisdiction under 18 U.S.C. § 3731.

## STATEMENT OF THE ISSUE

Does 18 U.S.C. § 922(g)(8), prohibiting possession of firearms by those subject to domestic-violence restraining orders, facially violate the Second Amendment?

## STATEMENT OF THE CASE

**1.** In May 2022, Perez's domestic partner reported to Kentucky police that Perez assaulted her. (ROA.185–87.) He was charged in Kentucky state court with fourth-degree assault and was released on bond. (ROA.188–89.) *See* Ky. Rev. Stat. § 508.030.[1] Perez's release conditions included several domestic-violence prohibitions, including a prohibition of "threatening to commit or committing acts of domestic violence or abuse against the alleged victim or other family or household member." (ROA.182.) *See* Ky. Rev. Stat. § 431.064(1)(a), (2) (authorizing release conditions prohibiting domestic violence and harassment after a determination that the defendant "[i]s a threat to the alleged victim or other family or household

---

[1] He has since pled guilty to a lesser charge of second-degree disorderly conduct. (ROA.200.) *See* Ky. Rev. Stat. § 525.060.

member"). In addition, the Family Court entered an "emergency protective order" on finding that Perez presented "an immediate and present danger of domestic violence and abuse." (ROA.183–84.) *See* Ky. Rev. Stat. § 403.730(2)(a). That order barred Perez from committing further abuse, threats, stalking, or sexual assault and from contacting his domestic partner or children. (ROA.183–84.)

In June 2022, Perez and two others entered a border checkpoint near Marfa, Texas, in an eighteen-wheeler driven by Perez. (ROA.10, 199.) Perez admitted to Border Patrol agents that he had a gun. (ROA.10, 199.) With Perez's consent, agents found the gun—a loaded 9-millimeter pistol—near the driver's seat. (ROA.10, 199.) Perez also had the Kentucky order imposing domestic-violence release conditions. (ROA.10–11, 199.)

**2.** Perez was charged in the Western District of Texas with possessing a gun while subject to a domestic-violence restraining order. (ROA.22.) *See* 18 U.S.C. § 922(g)(8).

Soon after, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The Court held that New York's "may-issue" licensing law—which allowed the executive to issue a license for public carry only on a showing of "proper cause"—violates the Second Amendment. *Id.* at 2123. The Court clarified that means-end scrutiny is inconsistent with its Second Amendment precedents. *Id.* at 2127–29. It said: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The

2

government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

Perez moved to dismiss the indictment, arguing that § 922(g)(8) violates the Second Amendment under *Bruen*'s framework. (ROA.44–64.) The district court ruled that § 922(g)(8) facially violates the Second Amendment under *Bruen*'s framework and thus granted Perez's motion to dismiss. (ROA.205–36.) *See United States v. Perez-Gallan*, --- F. Supp. 3d ---, 2022 WL 16858516 (W.D. Tex. 2022). The court then granted Perez's motion for release from pretrial detention. (ROA.240.) The government appealed. (ROA.241–42.)

**3.** While this appeal was pending, this Court held in another case that § 922(g)(8) facially violates the Second Amendment. *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *pet. for cert. filed*, No. 22-915 (Mar. 17, 2023). On March 17, 2023, the government filed a petition for a writ of certiorari challenging this Court's decision in *Rahimi*. "Given the significant disruptive consequences of [this Court's] decision," the government sought certiorari "on a highly expedited schedule—a little more than two weeks after the issuance of [this Court's] final amended opinion—in order to allow the [Supreme] Court to consider the petition before it recesses for the summer." Petition for Writ of Certiorari at 15–16, *United States v. Rahimi*, No. 22-915 (Mar. 17, 2023).

Because the final outcome of *Rahimi* would be outcome-determinative in this case, the government moved to stay this case pending its certiorari petition in *Rahimi*. This Court denied a stay. *See* Order, *United States v. Perez-Gallan*, No. 22-51019 (5th Cir. Apr. 6, 2023), ECF No. 43-2. Thus, the government files this brief conceding that *Rahimi* forecloses its appeal but raising its arguments to preserve them for further review.

## SUMMARY OF THE ARGUMENT

"Firearms and domestic strife are a potentially deadly combination." *United States v. Hayes*, 555 U.S. 415, 427 (2009). More than a million acts of domestic violence occur in the United States every year, and the presence of a firearm increases the chance that violence will escalate to homicide. *United States v. Castleman*, 572 U.S. 157, 160 (2014); *see id.* at 159–60. "All too often, … the only difference between a battered woman and a dead woman is the presence of a gun." *Id.* at 160 (brackets and citation omitted).

In § 922(g)(8), Congress sought to address that problem by disarming individuals who are subject to domestic-violence restraining orders. That prohibition comes into operation only if a court finds, after notice and a hearing, that a person poses a credible threat to the physical safety of an intimate partner or child or expressly forbids the person from using, attempting to use, or threatening to use physical force against the intimate partner or child. And the prohibition lasts only as long as the restraining order remains in effect.

4

The district court erred by holding that § 922(g)(8) facially violates the Second Amendment under *Bruen*'s framework. *Bruen* asks whether the Second Amendment's plain text covers the conduct at issue and, if so, whether the challenged gun restriction is consistent with the nation's historical tradition of gun regulation. Each of those inquiries independently sustains § 922(g)(8). The Second Amendment's text codified a right that covers only law-abiding, responsible citizens and thus excludes those subject to domestic-violence restraining orders—whose conduct has necessarily demonstrated that they are not law-abiding. And even if the amendment's text covered Perez, § 922(g)(8) squares with the longstanding tradition of disarming dangerous people.

## STANDARD OF REVIEW

This Court "review[s] preserved challenges to the constitutionality of a criminal statute *de novo*." *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014).

## ARGUMENT

The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." But that right is "not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). Section 922(g)(8)'s temporary prohibition on possessing a firearm while subject to a domestic-violence restraining order is consistent with the right to keep and bear arms because people subject to such orders fall outside the

protection of the amendment's plain text, and, in any event, § 922(g)(8) squares with the nation's historical tradition of gun regulation.

The district court ruled that § 922(g)(8) facially violates the Second Amendment. Facial challenges "should be granted sparingly and only as a last resort." *United States v. McGinnis*, 956 F.3d 747, 752–53 (5th Cir. 2020). A party bringing a facial challenge can succeed only "by 'establishing that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (brackets omitted). "[F]acial challenges are best when infrequent." *Sabri v. United States*, 541 U.S. 600, 608 (2004). "Although passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks." *Id.* at 608–09.

"Facial challenges are disfavored for several reasons." *Washington State Grange*, 552 U.S. at 450. First, facial challenges "often rest on speculation" and so "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Id.* (quoting *Sabri*, 541 U.S. at 609). Second, facial challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to

6

which it is to be applied." *Id.* (quotation marks omitted). Third, "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451.

## I.   The Second Amendment's plain text does not cover those subject to domestic-violence restraining orders.

The Second Amendment codified a preexisting understanding of the right to bear arms as covering only law-abiding, responsible citizens. Individuals subject to § 922(g)(8) are not responsible or law-abiding because their conduct evidencing a "credible threat to the physical safety" of an intimate partner will ordinarily violate laws prohibiting assault, battery, or threats. Perez cannot show that § 922(g)(8) burdens conduct protected by the Second Amendment.

The Second Amendment does not cover all citizens. "[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right," neither "granted by the Constitution" nor "dependent upon that instrument for its existence." *Heller*, 554 U.S. at 592; *see also id.* at 599 (explaining that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). So the right to bear arms is "enshrined with the scope [it was] understood to have when the people adopted [it]." *Id.* at 634–35.

"The founders understood that not everyone possessed Second Amendment rights." *Range v. Att'y Gen.*, 53 F.4th 262, 271 (3d Cir. 2022) (brackets omitted), *reh'g en banc granted, opinion vacated sub nom.*, 56 F.4th 992 (3d Cir. 2023).[2] To the contrary, "the history of the 'pre-existing right' of 'the people' to 'keep and bear arms,' codified in the Second Amendment, demonstrates that the Second Amendment right extended, and continues to extend, 'to some categories of individuals, but not others.'" *United States v. DaSilva*, No. 3:21-CR-267, 2022 WL 17242870, at *7 (M.D. Penn. Nov. 23, 2022) (quoting *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044 (11th Cir. 2022)). So "even individuals who are indisputably part of 'the people' … might not partake of that pre-existing right and, therefore, may be prohibited from possessing firearms without offending the Second Amendment." *Id.* (quoting *Jimenez-Shilon*, 34 F.4th at 1045–46).

*Heller* described the preexisting right to bear arms as a "right of law-abiding, responsible citizens." 554 U.S. at 635. Echoing *Heller*, *Bruen* likewise repeatedly described the Second Amendment right as belonging only to law-abiding citizens. *See, e.g.*, 142 S. Ct. at 2122 (stating that *Heller* "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense"); *id.* at 2131 (quoting *Heller*'s statement that the Second

---

[2] Although the Third Circuit has granted rehearing en banc and vacated the panel opinion in *Range*, the government cites it for its persuasive value and historical analysis, as many courts have done since it was vacated. *See, e.g.*, *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023).

Amendment protects "'the right of law-abiding, responsible citizens to use arms' for self-defense"); *id.* at 2133 (stating that the historical inquiry should consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id.* at 2156 (holding that New York's licensing law violates the Second Amendment because "it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms"); *see also Range*, 53 F.4th at 271 (noting that "the [*Bruen*] majority characterized the holders of Second Amendment rights as 'law-abiding' citizens no fewer than fourteen times"). None of those references suggest that the Second Amendment curbs laws restricting the gun rights of non-law-abiding citizens.

Three more aspects of the *Bruen* opinion further confirm that a person's status as non-law-abiding counts at its first, textual inquiry:

First, the *Bruen* opinion itself addressed whether the petitioners were law-abiding citizens in the section (III.A) addressing the Second Amendment's textual scope, not the section (III.B) addressing historical tradition. *See* 142 S. Ct. at 2134. The Court observed that the parties did not dispute "that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." *Id.* (citing *Heller*, 554 U.S. at 580). The Court thus implied that the Second Amendment covered them *because* they were undisputedly law-abiding citizens.

9

Second, *Bruen* (along with *Heller*) set contrary presumptions depending on whether a law prevents law-abiding citizens from bearing arms. *Heller* established that laws disarming "felons and the mentally ill"—and some other gun regulations—are "presumptively lawful." 554 U.S. at 626 & n.26. In contrast, *Bruen* held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," so that laws prohibiting the conduct are presumptively *unlawful*. 142 S. Ct. at 2126. *Bruen*'s presumptive protection could be "[i]n keeping with" *Heller*'s presumptive lawfulness, *see id.*, only if *Heller*'s "presumptively lawful" regulations burden no conduct covered by the amendment's text. In other words, at least some status-based restrictions of people considered non-law-abiding or irresponsible—"felons and the mentally ill"—are "presumptively lawful" *because* the Second Amendment's text excludes those people.

Third, *Bruen* explained that its opinion should not "be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes," which "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right." 142 S. Ct. at 2138 n.9 (citing *Heller*, 554 U.S. at 635); *see also id.* at 2161 (Kavanaugh, J. concurring) ("[T]he 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so."). Those regimes require background checks and set "narrow, objective, and definite standards" meant to ensure "that those bearing arms in the

10

jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* at 2138 n.9 (quotation marks omitted). And many states' standards disqualify anyone prohibited by federal law from having a gun.[3] By indicating that those regimes remain broadly constitutional (unless abused, as when "lengthy wait times … or exorbitant fees deny ordinary citizens their right to public carry"), the Court implied that the Second Amendment's text excludes people (like those disqualified by laws like § 922(g)(8)) considered non-law-abiding. Otherwise, the 43 states' many objective criteria disqualifying applicants for licenses—and thus preventing them from bearing arms—could survive only through case-by-case, historical inquiries. The Court suggested no such thing.[4]

In *Bruen*'s wake, "[t]he majority of courts have concluded that the [Second Amendment] right extends only to law-abiding citizens." *United States v. Black*, No. CR 22-133-01, 2023 WL 122920, at *3 (W.D. La. Jan. 6, 2023) (collecting cases). In rejecting a challenge to § 922(g)(1)'s prohibition of gun possession by convicted felons, for instance, the Third

---

[3] *See, e.g.*, Ky. Rev. Stat. § 237.110(4)(a) (requiring that the applicant "[i]s not prohibited from the purchase, receipt, or possession of firearms, ammunition, or both pursuant to 18 U.S.C. 922(g), 18 U.S.C. 922(n), or applicable federal or state law"); La. Stat. Ann. § 40:1379.3(C)(1)(b)(17) (requiring that the applicant "[n]ot be ineligible to possess or receive a firearm under 18 U.S.C. 922(g) or (n)").

[4] The breadth and variability of objective criteria applied by the 43 shall-issue states was not lost on the Court, which collected citations to all the licensing regimes and described how some work. *See Bruen*, 142 S. Ct. at 2123 n.1.

Circuit panel opinion in *Range* (now vacated pending en banc review) explained that "[t]hose whose criminal records evince disrespect for the law are outside the community of law-abiding citizens entitled to keep and bear arms." *Range*, 53 F.4th at 273. The court "[i]nterpret[ed] the text of the Second Amendment in light of the right's 'historical background,'" *id.* at 282 (quoting *Bruen*, 142 S. Ct. at 2127), surveying historical status-based gun laws from 1600s England through the amendment's ratification, *see id.* at 274–81. It held that the Second Amendment's scope "properly excludes those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses, whether or not those crimes are violent." *Id.* at 266; *see also United States v. Sitladeen*, --- F.4th ----, 2023 WL 2765015 (8th Cir. 2023) ("[T]he law of our circuit is that unlawful aliens are not part of 'the people' to whom the protections of the Second Amendment extend.").

People subject to § 922(g)(8) are, by definition, not law-abiding, responsible citizens and therefore fall outside the scope of the Second Amendment's plain text. Section 922(g)(8) applies only to those who have been judicially determined, "after a hearing" and "actual notice," to present a "credible threat" or "real threat" to the physical safety of another person. 18 U.S.C. § 922(g)(8)(A), (C)(i); *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001). Such a person is not a "law-abiding" citizen because the conduct that led to the restraining order constitutes an assault, battery, or criminal threat, and the person can hardly be termed

"responsible." Thus, all (or nearly all) people subject to a qualifying domestic-violence restraining order have committed a crime.[5]

## II. Section 922(g)(8) squares with the nation's historical tradition of gun regulation.

Even if the Second Amendment covers those subject to domestic-violence restraining orders, § 922(g)(8) is consistent with the right to bear arms because it squares with the historical tradition of disarming dangerous individuals.

**1.** When comparing modern and historical gun laws, courts must often "reason[] by analogy," which "requires a determination of whether the two regulations are relevantly similar." *Bruen*, 142 S. Ct. at 2132 (quotation marks omitted). *Bruen* gave no "exhaustive survey of the features that render regulations relevantly similar" but noted "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. In other words, the central inquiry is "whether

---

[5] Section 922(g)(8) requires a restraining order that either "includes a finding that [the] person represents a credible threat to the physical safety of [the person's] intimate partner or child," § 922(g)(8)(C)(i), or "by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury," § 922(g)(8)(C)(ii). Subsection (C)(ii) does not specifically require a finding of a credible threat. But this Court held in *Emerson* (in analysis unaffected by *Bruen*) that "Congress in enacting § 922(g)(8)(C)(ii) proceeded on the assumption that the laws of several states were such that court orders … should not embrace the prohibitions of paragraph (C)(ii) unless such either were not contested or evidence credited by the court reflected a real threat or danger of injury to the protected party by the party enjoined." 270 F.3d at 262.

modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133.

"[A]nalogical reasoning," the Court continued, is not "a regulatory straitjacket." *Id.* at 2133. It "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.*; *see also Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012) ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue.").[6] "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

*Bruen*'s guidance forecloses simply "comparing the modern law under review with the laws of a couple of centuries ago, like a redline comparison in a word processing application." *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022). That is

---

[6] *Bruen* abrogated *National Rifle*'s application of means-end scrutiny to the Second Amendment. *See* 142 S. Ct. at 2127 n.4. But this Court was "inclined to uphold the challenged federal laws at step one of [its pre-*Bruen*] analytical framework," *see Nat'l Rifle*, 700 F.3d at 204, which relied on text and history and was "broadly consistent with *Heller*," *see Bruen*, 142 S. Ct. at 2127. Nothing in *Bruen* abrogates this Court's or other courts' textual or historical analyses at "step one" of their pre-*Bruen* frameworks. *See United States v. Grinage*, No. SA-21-CR-00399-JKP, 2022 WL 17420390, at *2 (W.D. Tex. Dec. 5, 2022) ("[T]o the extent pre-*Bruen* cases relied on textual and historical analysis to find firearms restrictions constitutional, those cases are still good law.").

14

"because a list of the laws that *happened to exist* in the founding era is, as a matter of basic logic, not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *Id.* A court conducting *Bruen*'s historical inquiry must not only "consider what earlier legislatures did, but imagine what they could have imagined." *Id.*; *see also United States v. Lewis*, No. CR-22-368-F, 2023 WL 187582, at \*4 (W.D. Okla. Jan. 13, 2023) (considering how "a colonial legislature would have" assessed "the hazard presented by an armed habitual user of illegal drugs"); *United States v. Nutter*, No. 2:21-CR-00142, 2022 WL 3718518, at \*5 (S.D.W. Va. Aug. 29, 2022) (framing the "core question" as "whether the prohibition at issue *would have been viewed* as consistent with the Second Amendment in the founding era" (emphasis added)).

Finally, *Bruen*'s historical inquiry does not split into (1) a "straightforward" approach for laws "address[ing] a general societal problem that has persisted since the 18th century," which requires a "distinctly similar" historical law; and (2) "a more nuanced approach" for laws addressing "unprecedented societal concerns," which calls for analogical reasoning. The court did not discuss those concepts in absolute or mandatory terms. It merely offered guidance on how courts "may" approach cases depending on their context. *See id.* at 2132. It used the phrase "distinctly similar" only once, and even then described "the lack of a distinctly similar historical regulation" only as "relevant evidence"—not as dispositive. *See id.* at

2131. *Bruen* itself considered a law addressing a persistent problem, *id.* at 2131–32, but still scoured centuries of English and American history for relevantly similar analogues, *see id.* at 2135–56. Courts making the historical-tradition inquiry have thus recognized that they can take both "straightforward" and other approaches to the *same case* as needed. *See, e.g.*, *United States v. Charles*, No. MO:22-CR-00154-DC, 2022 WL 4913900, at *4 (W.D. Tex. Oct. 3, 2022) ("With the straightforward historical inquiry unclear, a more nuanced approached is necessary.").

**2.** Consistent with longstanding historical tradition, the Second Amendment allows the government to disarm dangerous individuals— those who would pose a serious risk of harm to themselves or others if allowed to possess a firearm. As noted, the Second Amendment "codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (citation omitted). In England, a 17th century statute empowered the government to "seize all arms in the custody or possession of any person" who was "judge[d] dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13. The use of that statute "continued unabated" after the adoption of the 1689 English Bill of Rights, which expressly guaranteed the right to keep and bear arms. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405 (2019).

Colonial and early state legislatures likewise disarmed individuals who "posed a potential danger" to others. *Nat'l Rifle*, 700 F.3d at 200.

16

Some early laws categorically disarmed entire groups deemed dangerous or untrustworthy, such as those who refused to swear allegiance. *Id.*; *see, e.g.*, Act of May 1, 1776, ch. 21, § 1, 1776 Mass. Acts 479; Act of June 13, 1777, ch. 21, § 4, 1777 Pa. Laws 63; Act of May 28, 1777, ch. 3 (Va.), *reprinted in* 9 William Waller Hening, *The Statutes at Large; Being a Collection of all the Laws of Virginia from the First Session of the Legislature, in the Year 1619*, at 281–83 (1821). Other laws called for case-by-case judgments about dangerousness. *See, e.g.*, Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90 (empowering officials to "take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements and Ammunition which they own or possess"). Still other laws disarmed individuals who had demonstrated their dangerousness by engaging in some types of conduct, such as carrying arms in a manner that spreads fear or terror among the people. *See, e.g.*, Act for the Punishing of Criminal Offenders, 1692 Mass. Laws 11–12; Act for the Punishing of Criminal Offenders, 1696–1701 N.H. Laws 15.

Precursors to the Second Amendment proposed in the state ratifying conventions likewise suggest that legislatures may disarm certain categories of individuals, including those who are dangerous. A proposal presented at the Pennsylvania ratifying convention, for instance, stated that "no law shall be passed for disarming the people or any of them unless for crimes committed, *or real danger of public injury from individuals*." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (emphasis

added). A proposal presented by Samuel Adams at the Massachusetts ratifying convention likewise provided that Congress may not "prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." *Id.* at 681 (emphasis added).

Post-ratification practice points in the same direction. In the mid-19th century, many States enacted laws requiring "those threatening to do harm" to "post bond before carrying weapons in public." *Bruen*, 142 S. Ct. at 2148; *see, e.g.*, Mass. Rev. Stat. ch. 134, § 16, 750 (1836); Me. Rev. Stat. ch. 169, § 16, 709 (1840); Mich. Rev. Stat. ch. 162, § 16, 162 (1846). Those statutes show that individuals who were "reasonably accused of intending to injure another or breach the peace" could properly be subject to firearm restrictions that did not apply to others. *Bruen*, 142 S. Ct. at 2148–49. Or as one early scholar wrote, the government may properly restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them." William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829).

The understanding that dangerous individuals could be disarmed persisted after the Civil War. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," but that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908–09 (1866). A circular issued by the Freedman's Bureau around the same time explained that

18

a person "may be disarmed if convicted of making an improper or dangerous use of weapons." *Bruen*, 142 S. Ct. at 2152 (citation omitted).

Section 922(g)(8) fits squarely within the longstanding tradition of disarming dangerous individuals. As set forth above, it applies only if the restraining order either (1) includes a finding that the individual poses a "credible threat to the physical safety" of an intimate partner or child or (2) expressly prohibits the "use, attempted use, or threatened use of physical force" against the intimate partner or child. 18 U.S.C. § 922(g)(8)(C). Everyone who satisfies the first criterion, by definition, poses a danger to others. And in adopting the second criterion, Congress reasonably concluded that courts would specifically prohibit the use, attempted use, or threatened use of force only if "evidence credited by the court reflected a real threat or danger of injury to the protected party." *Emerson*, 270 F.3d at 262. Thus, contrary to the district court's conclusion, § 922(g)(8) survives *Bruen*'s historical inquiry.

Other circuits reached the same conclusion under historical analyses that survive *Bruen*. Before *Bruen*, the courts of appeals had "coalesced around a 'two-step' framework for analyzing Second Amendment challenges." *Bruen*, 142 S. Ct. at 2125. At the first step, the government could justify the challenged law by showing that it fell outside the scope of the Second Amendment as originally understood; at the second step, it could justify the regulation by showing that it survived strict or intermediate scrutiny. *See id.* at 2126. In *Bruen*, this Court recognized that the first step

was "broadly consistent with *Heller*" but rejected the second step as "one step too many." *Id.* at 2127.

Before *Bruen*, the Third and Eighth Circuits upheld § 922(g)(8) under the first step of that two-part framework. In *United States v. Boyd*, 999 F.3d 171 (3d Cir. 2021), the court found "longstanding historical support" for the principle that "'legislatures have the power to prohibit dangerous people from possessing guns.'" *Id.* at 186 (citation omitted). It concluded that "those who are subject to domestic violence protective orders covered by § 922(g)(8) fall within the historical bar of presumptively dangerous persons." *Id.* Similarly, in *United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011), the court cited "historical support" for disarming "citizens who are not law-abiding and responsible." *Id.* at 1183. The court concluded that § 922(g)(8) is consistent with the "tradition" of limiting the right to keep and bear arms to "peaceable" citizens. *Id.* at 1184. Because these cases applied the historical approach that *Bruen* endorsed—not intermediate scrutiny—they remain good law. And they continue post-*Bruen* to model the correct historical analysis of § 922(g)(8) under the Second Amendment.[7]

---

[7] Three other circuits, including this one, had upheld § 922(g)(8) under intermediate scrutiny. *See United States v. Chapman*, 666 F.3d 220, 231 (4th Cir. 2012); *United States v. McGinnis*, 956 F.3d 747, 758 (5th Cir. 2020); *United States v. Reese*, 627 F.3d 792, 801–04 (10th Cir. 2010).

## CONCLUSION

This Court should reverse the district court's order dismissing Perez's indictment.

Respectfully submitted,

JAIME ESPARZA
United States Attorney

*/s/ Charles E. Fowler, Jr.*
CHARLES E. FOWLER, JR.
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that on April 26, 2023, I filed this brief through this Court's electronic case-filing system, which will serve it on all registered counsel.

*/s/ Charles E. Fowler, Jr.*
CHARLES E. FOWLER, JR.
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

I certify that

1. this brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,024 words, excluding the parts exempted by Rule 32(f); and

2. this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 365 in size 14 Calisto MT font.

Dated: April 26, 2023

*/s/ Charles E. Fowler, Jr.*
CHARLES E. FOWLER, JR.
Assistant United States Attorney