Shane O'Neal
101 E. Avenue B,
Alpine, TX 79830

September 5, 2024

Mr. Lyle W. Cayce, Clerk
VIA CM/ECF

   Re: *United States v. Perez-Gallan*, No. 22-51019

Dear Mr. Cayce,

The reasoning of *United States v. Rahimi*, 144 S. Ct. 1889 (2024) (*Rahimi 2024*) and *United States v. Connelly,* No. 23-50312, 2024 WL 3963874 (5th Cir. Aug. 28, 2024), support Perez-Gallan's constitutional challenge to § 922(g)(8)(C)(ii). In *Rahimi*, the Supreme Court held that a different subsection dealing with protective orders that find a credible threat of violence--§ 922(g)(8)(C)(i)—was constitutional. 144 S. Ct. at 1904. By contrast, the subsection Perez-Gallan was indicted under—§ 922(g)(8)(C)(ii)—requires no such finding of a credible threat. Instead, it prohibits a person from possessing a firearm if a restraining order "prohibits the use, attempted use, or threatened use of physical force against [an] intimate partner"—Perez-Gallan's wife more than 1,000 miles away in Kentucky. The district court dismissed the indictment, finding that the government alleged only a violation of § 922(g)(8)(C)(ii), ROA.207, an unconstitutional regulation of Perez-Gallan's rights. ROA.208-35.

  **A.** **Evaluating Second Amendment challenges post-*Rahimi 2024*.**

To find the limits of the Second Amendment, the Supreme Court's recent opinions prescribe "a two-step process . . . . *First*, [courts] ask whether the Second Amendment's plain text covers an individual's conduct." *Connelly*, 2024 WL 3963874, at *2. As "a member of our political community" Perez-Gallan "has a presumptive right to bear arms," regardless of any alleged crimes. *Id*. at *3. "Second [courts] ask whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. It is the government's burden to demonstrate that the challenged regulation is relevantly similar to laws our tradition is understood to permit." *Id*. at *2.

  **B.** **Section 922(g)(8)(C)(ii) is facially unconstitutional because it is incompatible with the nation's regulatory tradition.**

The government urged that it can disarm "dangerous" people. Gov't Br. at 16-20. The Supreme Court has read the same laws urged by the government more narrowly,

finding the government may "disarm individuals" "only once a court has found that the defendant represents a credible threat to the physical safety of another." *Rahimi 2024*, 144 S. Ct. at 1901-02. Further, this Court has found that "presently intoxicated persons" are dangerous for the same reasons that the founding record supports "banning the *carry* of firearms *while actively intoxicated*." *Connelly*, 2024 WL 3963875, at *9-10. Both the Supreme Court's decision in *Rahimi 2024* and this Court's decision in *Connelly* show that "dangerousness," by itself, is too vague a descriptor to support stripping a person of his Second Amendment rights. Instead, the government must show that a person is dangerous for a similar reason and to a similar degree that would have justified disarmament at the founding.

This Court has found that § 922(g)(8) is inconsistent with the nation's tradition of firearm regulation. *United States Rahimi*, 61 F.4th 443, 460-61 (5th Cir. 2023) (*Rahimi 2023*). The Supreme Court reversed but found only that (C)(i) was facially consistent with the nation's tradition; it declined to "decide whether regulation under Section 922(g)(8)(C)(ii) is also permissible." *Rahimi 2024*, 144 S. Ct. at 1898-99. Because the Supreme Court did not change the inquiry and only disagreed with this Court's application of it to (C)(i), this Court is bound by the rule of orderliness to find (C)(ii) unconstitutional. *Rahimi 2023*, 61 F.4th at 450 ("Under the rule of orderliness, one panel of [this Court] may not overturn another panel's decision, absent an intervening change in law, such as by" the Supreme Court.) (quotations omitted).

> *(1). The findings required by Section 922(g)(8)(C)(ii) do not require or even indicate dangerousness.*

Section (C)(ii) disarms a person subject to a court order, issued after a hearing at which he had notice and an opportunity to participate, that restrains him from threatening his intimate partner, and "explicitly prohibits the use . . . of physical force against [an] intimate partner . . . that would reasonably be expected to cause bodily injury." 18 U.S.C. § 922(g)(8)(C)(ii). The statute does not require that the order find the person dangerous. Further, the prevalence of protective orders shows they are not a reliable indicator of dangerousness. Instead, a (C)(ii) order is common because (1) courts interpret the requirements of § 922(g)(8)(A) broadly, (2) respondents to petitions seeking orders often do not see a reason to challenge them, (3) petitioners often see advantages in attaining them, and (4) judges are eager to issue them.

Because a person merely must have notice and an opportunity to participate, a (C)(ii) order may issue without much process. For example, in *United States v. Calor*, when a husband appeared at a scheduled hearing for the limited purpose of requesting a

continuance, and the judge granted the continuance but issued a protective order for the interim, the Sixth Circuit found Calor's ability to present "reasons why the court should not enter an order finding that he posed a credible threat" sufficient to meet the requirements of § 922(g)(8)(A). 340 F.3d 428, 429-31 (6th Cir. 2003). In another case, a husband, living in Maine, received three days' notice of a hearing on a protective order in Texas, did not appear, and the order issued by default. *United States v. Miles*, 238 F.Supp.2d 297, 298 (D. Me. 2002). This Court would likely hold that § 922(g)(8)(A)'s requirements were met because otherwise "a defendant with all the protections that the statute contemplates could simply" not show up for the hearing and thereby avoid § 922(g)(8). *United States v. Banks*, 339 F.3d 267, 272 (5th Cir. 2003) (holding an agreed protective order sufficient).

Respondents often do not see a reason to contest (C)(ii) protective orders. A (C)(ii) order merely tells a person he cannot threaten an intimate partner with harm. Most people react with indifference. *See, e.g.*, *United States v. Lippman*, 369 F.3d 1039, 1041 (8th Cir. 2004) ("Lippman agreed to stipulate to entry of a restraining order even though he said he disagreed with the factual allegations in the application."); *United States v. Wilkey*, 2020 WL 4464668, at *1 (D. Mont. Aug. 4, 2020) (Respondent, appearing at a hearing in Florida, stated, "If you want to keep the protection order, go ahead. I'll be in Montana on Saturday."). Nothing in § 922(g)(8) requires the issuing court to inform a person, pre-issuance, that the order will result in forfeiture of his Second Amendment rights. *See Lippman*, 369 F.3d at 1041 ("Lippman says the judge did not inform him that possessing firearms while subject to the restraining order would violate federal law, but he admits that he was given a copy of the order and that it included notice of the firearms restriction.").

Petitioners see value in obtaining protective orders as leverage. *Rahimi 2023*, 61 F.4th at 465 (Ho, J. concurring and explaining the value of protective orders in divorce proceedings). Judges, fearful of blowback from not issuing an order, err on the side of issuing the order—sometimes to the degree that they issue mutual orders, disarming victims. *Id*. at 466 (Ho, J. concurring and explaining the incentives judges face and their resulting decisions). In sum, the issuance of a (C)(ii) protective order does not indicate dangerousness.

> *(2). Even if a (C)(ii) order indicates some dangerousness, it does not rise to the level that would have historically supported disarmament.*

This Court has previously suggested that Congress's enactment of § 922(g)(8)(C)(ii) assumed that state laws governing the issuance of protective orders required a showing that the party enjoined was a true danger. *United States v. Emerson*, 270

F.3d 203, 262 (5th Cir. 2001). The historical tradition justifies disarming someone "who poses a credible threat of violence to another." *Rahimi 2024*, 144 S. Ct. at 1904. The vague possibility of danger is insufficient. *See Connelly*, 2024 WL 3963875, at *9-10 (intoxication and possession of a weapon are not enough, the weapon must be carried during intoxication). The nation's historical treatment of domestic violence cannot support disarming someone who merely is ordered not to use physical force against his wife.

In *Rahimi 2024*, the Supreme Court found that a person who is so dangerous he represents a credible threat of violence to another may be disarmed by analogizing to historical "surety and going armed laws." 144 S. Ct. at 1901. Both of those laws specifically targeted public, armed violence. *See id*. at 1900 (surety laws targeted those who "go armed offensively"); *see also id*. at 1901 (going armed laws targeted those who ride "to terrify the good people" and disrupt "public order"). Historical practices regulating public, armed violence supported *Rahimi 2024* because Rahimi was publicly armed and violent towards his girlfriend and others. *Id*. at 1984-85.

The available analogies, however, cannot be stretched to include someone who is enjoined from privately using force so minimal it merely causes bodily injury. § 922(g)(8)(C)(ii). Domestic violence at the time of the founding was a problem that the government rarely intervened to solve and then only when the violence was substantial. "In accord with th[e] revolutionary notion of individual liberty and familial privacy, courts became notably reluctant to impose constraints on men's abusive treatment of their household dependents" after the American Revolution. R. Bloch, The American Revolution, Wife Beating, and the Emergent Value of Privacy, 5 Early American Studies 223, 241-44 (2007). Domestic violence only merited intervention when it rose to a level that it posed a credible threat to physical safety. K. Ryan, "The Spirit of Contradiction": Wife Abuse in New England, 1780-1820, 13 Early American Studies 586, 602 (2015) (documenting the case of Susannah Strong—one of the few to lead to intervention—whose husband "beat her, pulled her hair, kicked her out of bed, and spit in her face, times without number"). Because (C)(ii) orders only direct intimate partners not to use force capable of causing bodily injury against one another, § 922(g)(8)'s disarmament of the subjects of (C)(ii) orders defies analogy to the nation's history of firearm regulation.

   C.   **Section 922(g)(8)(C)(ii) is unconstitutional as applied.**

Even if § 922(g)(8)(C)(ii) is not facially unconstitutional, it is unconstitutional as-applied to Perez-Gallan. As discussed in the preceding section, Rahimi was publicly violent towards his girlfriend with a firearm. *Rahimi 2024*, 133 S. Ct. at 1894-95.

Regulation of Rahimi's possession of a firearm, therefore, was analogous to the surety and going-armed laws' regulation of public, armed violence in a way that regulation of Perez-Gallan's firearm possession simply is not.

Further, Rahimi's protective order was issued against him in Texas, and he was charged with possession of a firearm, in Texas, after police identified him as a suspect in multiple Texas shootings. *Id.* at 1895. Perez-Gallan, however, was subject to a Kentucky court order prohibiting him from contacting his wife who lived in Kentucky. ROA.199. He was found in possession of a firearm, "for protection while transporting valuable cargo," at a border patrol checkpoint in a dangerous area of West Texas. ROA.199-200; *see United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir. 1999) (describing Highway 67 from Presidio to Marfa as a "notorious smuggling route" in an "isolated" area of the country).

The government attempts to disarm Perez-Gallan as "dangerous," while traveling near the Texas-Mexico border, because his wife obtained an order restraining him after she alleged he was violent towards her once in Kentucky. The disarmaments that form the national tradition were both jurisdictionally and textually local. For example, in 1637 Massachusetts Bay leadership convicted Anne Hutchinson of sedition, banished her supporters, and disarmed those "permitted to remain in the colony." Joseph S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020). Later, when states passed laws regulating firearms, they were often explicitly limited to the state. For example, both North Carolina and Virginia passed laws prohibiting people who failed to take an Oath of Allegiance from keeping guns as long as they "remain[ed] in the State." *Id.* at 265. "The first two federal laws directly restricting civilian use and possession of firearms" were not passed until 1927 and 1934. *District of Columbia v. Heller*, 128 S. Ct. 2783, 2844 (2008) (Stevens, J., dissenting). The idea of disarming someone hauling valuable cargo through a high-crime border area whose only dangerous behavior had occurred 1,000 miles away, in his home, would have struck the founders as unthinkable. J. Blocher, *Firearm Localism*, 123 Yale L.J. 82, 117 (2013) (discussing the historical carrying of firearms through the untamed wilderness to protect against an array of threats).

Even if a (C)(ii) order shows the level of dangerousness necessary to justify disarmament consistent with the historical tradition, disarming Perez-Gallan's while he travels far from his wife is inconsistent with the nation's tradition of firearm regulation.

        Respectfully submitted,

        <u>s/ Shane O'Neal</u>
        SHANE O'NEAL
        O'NEAL LAW
        101 E. Avenue B
        Alpine, Texas 79830
        (713) 516-3505
        shane@shaneoneallaw.com
        *Attorney for Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE

1. This letter complies with the Court's August 22, 2024, order because it does not exceed five pages.

2. This letter complies with the typeface requirements of Federal Rule of Appelalte Procedure 32(a)(5) and the typestyle requireemtns of Rule 32(a)(6) because it has been prepared in a proportionally spaced, 14-point serif typeface using Times New Roman.

/s/ Shane O'Neal<br>Shane O'Neal

## CERTIFICATE OF SERVICE

I certify that on September 5, 2024, I electronically filed this letter with the Clerk of the Court of the U.S. Court of Appeals for the Fifth Circuit using the cm/ecf system. All participants in the case have been served using the cm/ecf system.

/s/ Shane O'Neal<br>Shane O'Neal